**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Landon L. Michael, | ) | |
| | ) | |
| Plaintiff | ) | **ORDER GRANTING** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | Case No. 4:15-cv-074 |
| Joshua Trevena and Ryan Chaffee in their | ) | |
| individual capacities as officers of the | ) | |
| Watford City Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' motion for summary judgment filed on July 28, 2016.

See Docket No. 19.  The Plaintiff filed a response in opposition to the motion on August 18, 2016.

See Docket No. 24.  The Defendants filed a reply brief on September 1, 2016.  See Docket No. 29.

For the reasons set forth below, the Defendants' motion for summary judgment is granted.


I.      **BACKGROUND**

In late June 2014, Landon Michael traveled with his mother (Sharon), sister (Stephanie), and

son (Brandon) from his home near Phoenix, Arizona, to Watford City, North Dakota.  Michael is

a native of Watford City.  The family rented a Dodge pickup truck for the trip.  Michael's mother

rented the vehicle and listed Michael as an authorized driver.

On or about July 3, 2014, a family squabble arose over using the rental vehicle to tow a van

back to Arizona.  The squabble pitted Michael against his mother and sister.  Michael was opposed

to using the rental vehicle to tow the van back to Arizona while his mother and sister favored the

idea.

During his visit to North Dakota, Michael spent some time staying at the home of his cousin,

Jim Sondrol, in Watford City. On July 5, 2014, Stephanie and Michael's aunt visited the Sondrol residence, and a verbal argument arose over the keys to the rental vehicle. Stephanie demanded Michael turn the keys over to her, and Michael refused. There were, apparently, two sets of keys for the rental vehicle. Before Stephanie and her aunt left the Sondrol residence, they stated they would be contacting law enforcement to resolve the dispute.

The Watford City Police Department received a telephone call at 7:00 p.m. on July 5, 2014, reporting the rental vehicle in question stolen. Chief Arthur Walgren, Officer Ryan Chaffee, and Officer Michael Trevena of the Watford City Police Department responded to the call at approximately 7:05 p.m. Upon arriving at the Sondrol residence, the officers found the family engaged in a heated argument over the keys to the rental vehicle. The dispute revolved around Michael's possession of both sets of keys, Michael's desire to speak with his mother, his mother's unwillingness to speak to Michael, and Michael's belief that his sister was keeping him from speaking to his mother. Chief Walgren reviewed the rental agreement and noted that Michael's mother rented the vehicle, and Michael was listed as an authorized driver. The officers determined the matter was civil in nature and encouraged the family to work out their differences. The officers encouraged Michael to return the keys to his mother. Michael turned over one set of keys while retaining the second set. No arrests were made or citations issued. The officers left the scene at 7:26 p.m. Unfortunately, the family was unable to completely resolve their petty dispute.

The next day, July 6, 2016, Michael's sister, Stephanie, again contacted law enforcement for help resolving the dispute over the vehicle keys. Officer Trevena eventually spoke with Stephanie by telephone. Officer Trevena agreed to meet Stephanie at the Sondrol residence and conduct a "civil standby" to ensure everyone behaved, and that the second set of keys, which Michael still had in his possession, would be returned to his mother who had rented the vehicle.

Officer Trevena arrived at the Sondrol residence shortly before 8:30 p.m. and found Michael seated in a lawn chair in the front yard. No other family members were present. Officer Trevena approached Michael and began to question him about the second set of keys.[1] The exchange began as follows:

TREVENA:  What's going…

MICHAEL:  What's going on?

TREVENA:  Is there another set of keys for the truck?

MICHAEL:  Possibly.

TREVENA:  Okay, I've had more than enough of this. I – this is all a civil issue.

MICHAEL:  Exactly…

See Trevena Video.

Officer Trevena again asked Michael if he had the second set of keys. Michael admitted he had the keys but stated the keys were at a different location. A debate then ensued as to whether Michael was entitled to possession of the keys as an authorized driver of the rental vehicle. Michael was adamant that he needed to talk to his mother, and his sister would not let him do so. During the exchange, Michael was uncooperative, emotional, and agitated. Officer Trevena was clearly frustrated with Michael's childish and irrational behavior. It is undisputed that Michael was not under the influence of drugs or alcohol during the incident. Officer Trevena told Michael he could be arrested for withholding property or deprivation of services and that he needed to get the keys and give them to his mother. Michael responded that he may want to press charges for harassment.

---

[1]The dash cameras from the officers' patrol vehicles captured much of the encounter. See Docket No. 22. The video from Officer Trevena's vehicle can be found at Docket No. 22, Ex. 3 ("Trevena Video"). The video from Officer Chaffee's vehicle can be found at Docket No. 22, Ex. 11 ("Chaffee Video").

Officer Trevena again inquired as to the location of the keys. Michael said he would have to go get them and then attempted to leave the scene in a vehicle. Officer Trevena told Michael that if he left he would be arrested. The following exchange then took place:

TREVENA: Where are they?

MICHAEL: I have to go pick them up.

TREVENA: Where are they?

MICHAEL: They are not with me, I've got to go get them.

TREVENA: That was something that you would tell me before you get into a car and take off.

MICHAEL: Sir I don't know what you fucking want from me.

TREVENA: Where are the keys at?

MICHAEL: I would like to speak to my mother, and I will hand the keys over to my mother.

TREVENA: Alright, where are the keys?

MICHAEL: I have them with a bunch of my other stuff at another location, okay? okay?

TREVENA: So you don't have the keys with you now?

MICHAEL: That's what I've been trying to tell you.

TREVENA: So if you talk to your mom, you're going to give her the keys?

MICHAEL: I will give her the keys, I need to speak with my mother one on one.

See Trevena Video.

After this conversation, Officer Trevena walked behind the vehicle and called Michael's sister. Michael's sister and his mother arrived in a minivan a few minutes later. Michael walked over to the minivan and instructed his mother to get out. Stephanie intervened and heatedly told

4

Michael to leave their mother alone. Michael again instructed his mother to get out of the van. Officer Trevena told Michael to sit down in the lawn chair and then went over to talk to Stephanie and Michael's mother. During the conversation, Michael's mother indicated that she did not wish to speak to Michael. Stephanie then get out of the van, approached Michael, and the two continued to argue over the keys.

At approximately 8:30 p.m., Officer Chaffee arrived on the scene and received an update from Officer Trevena. After the situation was explained to Officer Chaffee, both officers walked over to Michael and continued their attempts to persuade Michael to turn the keys over to his mother. Michael stated that he would give the keys to his mother if she came over to where he was seated. Officer Trevena asked Michael how he could give her the keys if he did not have the keys on his person. Michael responded by stating he would make sure she gets the keys. Michael then asked if they were stopping him from talking to his mother. Officer Trevena responded that he was not stopping him, but informed Michael that his mother did not want to talk to him.

At this time, Michael walked around the officers, behind the minivan, and approached the front passenger window where his mother was sitting and attempted to speak with his mother. As Michael approached, Stephanie started the minivan and began to drive away. Once Michael noticed the minivan driving away, he stuck his right foot out causing the rear passenger side tire to run over it. The following discussion then took place:

TREVENA: You intentionally put your foot under the vehicle.

MICHAEL: No, I. . .I did not intentionally do that.

TREVENA: Yeah, ya did.

MICHAEL: I did not in . . .you know I didn't, you are accusing me of nothin' just
to provoke me and I did not do no such thing.

5

See Chaffee Video.

During the above conversation , Michael went back to the yard, sat down in a lawn chair, and the discussion continued as follows:

TREVENA: Yeah, ya did.

MICHAEL: I did no such thing.  She just ran over my foot.

TREVENA: You were standing that far away . . .

MICHAEL: She just ran over my foot sir.  She ran over my foot.  You can be a witness against me in court.

TREVENA: Okay, she ran over your foot?

MICHAEL: You can be a witness against me in court.

TREVENA: Okay, did she intentionally run over your foot?

MICHAEL: Yes.

TREVENA: I am going to arrest you for providing a false statement to a peace officer right now.

MICHAEL: No you're not.

TREVENA: Stand up and turn around.

MICHAEL: No.

TREVENA: Put your hands behind your back.

MICHAEL: You have no reason.

CHAFFEE: Turn around.

MICHAEL: You have no reason.

CHAFFEE: Turn around.

MICHAEL: You have no fucking reason.

TREVENA:  Release your hands, or you will have force used against you.

6

MICHAEL:    I'll tell you what, you guys wanted to fucking do this all fucking day.

CHAFFEE:    Get up right now.

See Chaffee Video.

When Michael refused to get out of his chair and tensed up, the officers approached. Officer Trevena grabbed Michael by the right arm and throat. Officer Chaffee used a baton lever to perform a strong-side armlock to remove Michael from the chair. Officer Chaffee used both hands to insert the baton between Michael's chest and left arm. Once the baton was inserted, Officer Chaffee placed his right wrist to Michael's left wrist and grabbed the top portion of the baton with his left hand. Officer Chaffee then brought Michael's left arm forward in a lever action and captured his wrist behind his back. As Michael tensed up, the baton slipped out of Officer Chaffee's left hand. Officer Chaffee then regripped the baton to apply more force and complete the maneuver. While in the course of driving Michael down to the ground, the baton slipped out and fell to the ground. At this point, Officer Chaffee gained control of Michael's left hand. Officer Chaffee then pulled Michael's left arm behind him for handcuffing. During the course of the maneuver, Officer Chaffee heard a popping sound on Michael's left side as force was being applied to his left arm. Upon being handcuffed, Michael groaned in pain and reported his arm might be broken. During the take-down and handcuffing, Michael loudly and repeatedly stated that "I did nothing" and that he was not resisting. While still on the ground, the following exchange occurred.

MICHAEL:    Go ahead, I'm not resisting arrest here.

TREVENA:    Not anymore.

MICHAEL:    I wasn't resisting in the first place, I was just sitting my ass down on the private property , you just trying to come up and fucking come up with a reason to fucking do something.

TREVENA:    [unintelligible]

7

MICHAEL:    This isn't going to fucking stick.  Bullshit . . . this isn't going to fucking stick.

See Chaffee Video.

At this point, Officer Chaffee went to gather Michael's belongings.  The following conversation then took place between Michael and Officer Trevena:

MICHAEL:    Cuz I was not under any type of a arresting credidation (sic) of any sort.

TREVENA:    Okay.

MICHAEL:    Yeah

TREVENA:    Okay.  You provided false information to a police officer.

MICHAEL:    Okay, that's alright.  I'll tell you what, you're going to get a whole bunch of false information . . . [unintelligible]

TREVENA:    Actually, right now, Landon, you have the right to remain silent, anything you say can be used against you in court.  You have the right to an attorney . . .

MICHAEL:    There ya go, there ya go [unintelligible], that's what you needed to do.

TREVENA:    If you can't afford an attorney, one will be appointed to you.  Do you understand?

MICHAEL:    Yes, sir I do.

TREVENA:    Very good.  I have no other questions for you.

See Chaffee Video.

At this point, Michael told the officers he may need to go to the hospital.  Officer Trevena transported Michael to the McKenzie County Hospital Emergency Room where he was evaluated by Dr. Rylan Brantl.  Michael was diagnosed with a comminuted displaced subcapital humerous fracture of the left arm.  Michael was released from police custody at 12:15 a.m. on July 7, 2014,

8

and transported by ambulance to Trinity Hospital in Minot, North Dakota, for further evaluation. Approximately six hours after arriving at Trinity Hospital, Michael was released with his arm in a sling. The injury healed without the need for surgery.

Assistant McKenzie County State's Attorney Charles Neff, Jr. declined to pursue charges against Michael stating "Decline to charge. Resulted from civil matter and defendant suffered injuries during incident that equals any penalty imposed." See Docket No. 21-3. Michael filed the current lawsuit asserting claims against the Defendants for unlawful arrest and excessive force on June 10, 2015. See Docket No. 1. In their motion for summary judgment, the Defendants contend they are entitled to qualified immunity.


II.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of

material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  The court must consider the substantive standard of proof when ruling on a motion for summary judgment.  Anderson, 477 U.S. at 252.

III.    **LEGAL DISCUSSION**

The doctrine of qualified immunity shields public officials performing their duties from civil liability as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Stanton v. Sims, 134 S. Ct. 3, 4 (2013); El-Ghazzawy v. Barthiaume, 636 F.3d 452, 456 (8th Cir. 2011).  The purpose of the doctrine is to allow public officials to perform their duties "as they think right, rather than acting out of fear for their own personal fortunes."  Greiner v. City of Champlin, 27 F.3d 1346, 1351 (8th Cir. 1994).  The doctrine gives public officials "breathing room" to make reasonable mistakes of judgment and protects "all but the plainly incompetent or those who knowingly violate the law."  Stanton, 134 S. Ct. at 5 (internal citations omitted).  Whether an official is entitled to qualified immunity is a question of law for the court.  Greiner, 27 F.3d at 1352.  In assessing a claim of qualified the court must consider (1) whether the facts, viewed in a light most favorable to the plaintiff, establish the violation of a constitutional or statutory right, and (2) whether the right was clearly established such that a reasonable official would have known his actions were unlawful.  El-Ghazzawy, 636 F.3d at 456.; Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).

10

## A. <u>FALSE ARREST</u>

It is clearly established that individuals have a Fourth Amendment right not to be subject to warrantless arrest in the absence of probable cause. <u>Baribou v. City of Minneapolis</u>, 596 F.3d 465, 478 (8th Cir. 2010); <u>Habiger v. City of Fargo</u>, 80 F.3d 289, 295 (8th Cir. 1996). Police officers are entitled to qualified immunity if they make a warrantless arrest under the mistaken belief that they have probable cause, provided the mistake is objectively reasonable. <u>Smithson v. Aldrich</u>, 235 F.3d 1058, 1062 (8th Cir. 2000). Probable cause is a fluid concept not easily reduced to a neat set of legal rules. <u>Baribou</u>, 596 F.3d at 474. Probable cause exists when the totality of the facts and circumstances known to the arresting officer, and which are based upon reasonably trustworthy information, would justify a prudent person to believe that the individual arrested has committed, is committing, or is about to commit a crime. <u>Baribou</u>, 596 F.3d at 478; <u>Small v. McCrystal</u>, 708 F.3d 997, 1003 (8th Cir. 2013); <u>Arnott v. Mataya</u>, 995 F.2d 121, 124 (8th Cir. 1993). For purposes of a qualified immunity analysis, the issue is not whether probable cause in fact existed, but whether there existed arguable probable cause. <u>Harbiger</u>, 80 F.3d at 295; <u>Smithson</u>, 235 F.3d at 1062; <u>Baribou</u>, 596 F.3d at 478.

In this case, the officers arrested Landon Michael for providing false information to a law enforcement officer and resisting arrest. The Court rejects the Defendants' argument that Officer Chaffee did not arrest Michael as the dash-cam videos clearly show both officers removing Michael from his lawn chair and executing the arrest. And while there is some limited discussion in the briefs that Michael could have been arrested for theft, Michael was not arrested or charged with theft, the point is not well-developed, and the Court will not address it.

When Officer Trevena arrived at the Sondrol residence on July 6, 2014, he was aware of a dispute over the possession of the rental vehicle keys between Michael and his family from the

previous day. Upon arrival, Officer Trevena learned that Michael had another set of keys to the

rental vehicle in his possession. After Officer Trevena argued with Michael about the location of

the keys and talked with Michael's mother and sister, he observed the incident with the minivan

where Michael stuck his foot under the mini van's tire. Michael stated to Officer Trevena that his

sister had intentionally ran over his foot, and Officer Trevena would be a witness to the incident in

court. After hearing this report, Officer Trevena placed Michael under arrest for providing a false

statement to a law enforcement officer. It is obvious from a review of the dash-cam video of the

incident that Michael intentionally stuck his right foot under the minivan's rear passenger tire.

Under North Dakota law, providing false information or report to a law enforcement officer

is codified as follows:

> A person is guilty of a class A misdemeanor if that person:
>
> 1. Gives false information or a false report to a law enforcement officer which that person knows to be false, and the information or report may interfere with an investigation or may materially mislead a law enforcement officer; or
>
> 2. Falsely reports to a law enforcement officer or other security official the occurrence of a crime of violence or other incident calling for an emergency response when that person knows that the incident did not occur. "Security official" means a public servant responsible for averting or dealing with emergencies involving public safety.

N.D.C.C. § 12.1-11-03. This offense has four elements which are set forth in the North Dakota

Pattern Jury Instructions as follows:

> 1. That on or about July 6, 2014, in McKenzie County, North Dakota;
>
> 2. The Defendant willfully gave false information to a law enforcement officer;
>
> 3. The Defendant knew the information to be false;
>
> 4. The information may have interfered with an investigation; or may have materially misled a law enforcement officer.

North Dakota Pattern Jury Instruction K-15.21.

Michael's report of his sister intentionally running over his foot was clearly false. It is also clear that Michael's report did not interfere with an investigation or materially mislead law enforcement officers. Officer Trevena observed the incident himself and was aware that Michael intentionally placed his foot under the rear tire of the minivan. No reasonable person could watch the dash-cam video of the incident and come to any other conclusion. Michael was not convicted of providing a false statement to a law enforcement officer because the state's attorney declined to prosecute.

Nevertheless, the officers' misapprehension of the elements of the offense is not fatal to their request for qualified immunity. See Arnott, 995 F.2d at 124 (the fact that the person arrested is later found not guilty is not material to whether an officer had arguable probable cause to make an arrest). Police officers are not required to conduct a mini-trial before arresting a suspect. Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir. 1996). A mistaken belief that probable cause to arrest exists is sufficient for purposes of qualified immunity, so long as the mistake is objectively reasonable. Smithson, 235 F.3d at 1062. Qualified immunity applies to protect police officers from mistakes of law or fact or mistake based on mixed questions of law and fact. Pearson v. Callahan, 555 U.S. 223, 231 (2009).

The Eighth Circuit Court of Appeals analyzed a similar scenario in Habiger v. City of Fargo, 80 F.3d 289 (8th Cir. 1996). In *Habiger*, a North Dakota state trial court entered a temporary restraining order ("TRO") restricting protest activity in the immediate vicinity of the Fargo Women's Health Organization ("abortion clinic"). Id. at 291-92. The TRO contained a number of provisions including noise restrictions which enjoined the protestors from "obstructing the work of the persons located at FWHO facilities by any means--including singing, chanting, yelling, shouting,

or screaming--that substantially interferes with the provision of medical services including counseling, with[in] such facility" and a restriction prohibiting protestors from coming within 100 feet of the clinic when the clinic was open for business. Id. at 292 (alteration in original).

Three days after the trial court entered its TRO, Habiger and approximately seventy-five other protestors gathered to protest the issuance of the TRO near the clinic. Id. at 293. Several police officers were at the clinic to enforce the TRO. Id. Habiger walked over to one officer who instructed him that he could not cross the red line marking the 100 foot distance restriction outlined in the TRO. Habiger did not cross the red line, but loudly criticized the officer's conduct and the TRO. Id. at 294. Several protestors did cross the red line and were arrested. Id. Habiger loudly criticized the arresting officers. Id. The officer repeatedly told Habiger to quiet down, and he refused to do so. Finally, the officer placed Habiger under arrest for yelling too loud in violation of the TRO. Habiger resisted arrest, and it took several officers to restrain him. Id. Habiger claimed he was injured while being arrested and was treated at a local hospital for pain in his arm before being taken to jail. Habiger was charged with disorderly conduct and preventing arrest but the charges were later dismissed. Thereafter, Habiger brought suit against the officers in federal court alleging false arrest, excessive force, and a number of other claims. The trial court dismissed most of the claims on grounds of qualified immunity. The case went to trial on claims of excessive force and state law assault and battery, with a jury finding in favor of the officers.

On appeal, the Eighth Circuit found there was no dispute that Habiger was repeatedly yelling and screaming at the top of his voice. Id. at 295-96. Whether he could be heard inside the clinic was a judgment call on the part of the officers of the type that police officers are often called upon to make. Id. at 295. The Court went on to state that "an officer on duty in the field is entitled to make a reasonable interpretation of the law he is obligated to enforce." Id. at 296. The Eighth

Circuit concluded that "the officers arguably had probable cause for Habiger's arrest and were immune from suit." Id.

Given the facts known to Officers Trevena and Chaffee at the time of the arrest, the Court finds that the officers had arguable probable cause to arrest Michael for providing a false report to a law enforcement officer. This case involved the same type of judgment call the officers were required to make in *Harbiger*. While the officers were mistaken as to the elements of the offense, that mistake was not objectively unreasonable because Michael did make a false report and suggested Officer Trevena could be a witness to the incident in court. A mistake as to the specific elements of the state criminal offense can hardly be described as the type of plain incompetence which is not protected by the doctrine of qualified immunity. See Stanton, 134 S. Ct. at 5. Even seasoned lawyers make mistakes as to the elements of a criminal offense. The Court concludes that arguable probable cause existed to believe that Michael's behavior constituted the crime of providing a false information or report to law enforcement officers under North Dakota law. As a result, Officers Trevena and Chaffee are entitled to qualified immunity on the claim of false arrest.

### B.  EXCESSIVE FORCE

It is well-established that individuals have a Fourth Amendment right to be free from excessive force in the context of an arrest. Small, 708 F.3d at 1005. The test for qualified immunity is whether the amount of force used was objectively reasonable under the particular facts and circumstances of the case. The reasonableness of the amount of force used must be judged from the perspective of a reasonable officer at the scene rather than by the 20/20 vision of hindsight. Bishop v. Glazier, 723 F.3d 957, 961 (8th Cir. 2013); Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)); see also Kukla v. Hulm, 310 F.3d 1046,

1050 (8th Cir. 2002). The nature and quality of the intrusion on the individual's Fourth Amendment rights must be balanced against the government's countervailing interests. Montoya v. City of Flandreau, 669 F.3d 867, 871 (8th Cir. 2012). Relevant circumstances include the severity of the offense at issue, whether the suspect poses an immediate safety threat, and whether the suspect is actively resisting arrest or attempting to flee. Graham, 490 U.S. at 396; Small, 708 F.3d at 1005; Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010). The degree of injury suffered is also relevant in that it shows how much force was used. Montoya, 669 F.3d at 871. Force is least justified against non-violent misdemeanants who are not fleeing, actively resisting, and pose little or no threat to officer or public safety. Id.

Prior to the use of force in this case, Landon Michael was informed that he was under arrest for providing a false report to law enforcement, a non-violent class A misdemeanor punishable by up to one year imprisonment. It is undisputed this is a low level offense. Michael was also arrested for resisting arrest which is also a class A misdemeanor in North Dakota. See N.D.C.C. § 12.1-08-02.

As revealed by the dash-cam videos, Michael's demeanor during the encounter was volatile, non-compliant, obstinate, and childish. He was not fleeing, although at one point he did attempt to leave the scene but stopped when ordered to do so by Officer Trevena. He did not appear to pose a safety threat to the officers or the public, although he repeatedly refused to comply with the officers commands and cursed at them. By the time force was used, the officers had witnessed Michael scream at his family, stick his foot under a moving vehicle, and repeatedly disobey their commands.

As evidenced by the dash-cam videos, Michael resisted arrest by telling the officers he was not under arrest, by not complying with the command to stand up, and by tensing up and firmly

16

gripping the arms of the lawn chair. Michael's juvenile behavior necessitated the use of force by resisting arrest. Had he not resisted arrest, he would not have been injured. Michael was told, before force was used, that he needed to release his hands or force would be used against him. It is clear under Eighth Circuit case law that when an arrestee resists, some use of force by the police is reasonable. See Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994) (finding a severed tendon in a finger resulted from the arrestee's own actions in resisting arrest); Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017). The right to make an arrest carries with it the right to use some degree of physical force to effect the arrest. See Graham, 490 U.S. at 396. Judgments as to the amount of force necessary to effectuate an arrest require split-second judgments when, as in cases such as this, the situation is rapidly evolving. Id. at 397. Not every push or shove violates the Fourth Amendment. Id. at 396.

In this case, the situation was fluid and the arrestee was volatile and non-compliant. Officer Chaffee used his baton as a lever under Michael's left arm to loosen his grip on the lawn chair and remove Michael from the chair, a maneuver Officer Chaffee had been trained to use in such situations. A reasonable officer in this situation would interpret Michael's behavior as non-compliant and resistive. The officers worked jointly to take Michael to the ground and handcuff him with Officer Trevena positioned on Michael's right side and Officer Chaffee positioned on his left. In the process of executing the arrest a popping sound was heard, and Michael's left arm was broken. The injury healed without need for surgery and without permanent impairment. However, the degree of injury is not dispositive. Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011). Rather, the Court must look at whether the amount of force applied was reasonable from the perspective of a reasonable officer on the scene.

A review of the dash-cam videos reveals the  amount of force employed was appropriate to

17

the task at hand.  See Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2000) (noting that when

a suspect passively resists more force may be necessary and it was reasonable to pull the driver out

of the vehicle and take him to the ground); Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076,

1082 (8th Cir. 1990) (finding it reasonable to pull a non-compliant motorist from his vehicle).  The

takedown did not violate a constitutional right.  While the injury in this case was unfortunate, the

Court cannot say the amount of force used by the officers was unreasonable under the

circumstances.  Based on the facts and circumstances present, and after a careful review of the dash-

cam videos, the Court finds the amount of force used was not objectively unreasonable.  The officers

reasonably interpreted Michael's behavior as resistance.  Further, the Court concludes that a

reasonable officer would not have understood the action in question to constitute excessive force.

As such, the law enforcement officers are entitled to qualified immunity on Michael's claim of

excessive force.


## IV.    CONCLUSION

The Court has carefully reviewed the parties' submissions, the dash-cam videos, and the

entire record, and concludes the Defendants are entitled to qualified immunity.  Accordingly, the

Defendants' motion for summary judgment (Docket No. 19) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 22nd day of February, 2017.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court
